The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Robert J. Steigman presiding. Thank you, Mr. Bailiff. Good afternoon, Council. This is our case number 4-22-0427, Henry D. S. O'Meara, for the appellant. Council, please identify yourself. Good afternoon, Your Honor. James Schmidt. Thank you. And for the appellate, Council, please identify yourself. Lynn Harrington. Okay, thank you. Mr. Schmidt, you may proceed, sir. Thank you, Your Honor. May it please the Court. Council. The right of a parent to raise his or her child is among the most fundamental liberty interests recognized by the Constitution. As such, termination of that interest is a drastic measure. Indeed, few forms of state action are both so severe and so irreversible. Now, in this case, the state failed to clearly and convincingly prove that Sharon was an unfit parent. The state also failed to prove that it was in B.S.'s interest to terminate Sharon's and even if so, in doing so, it relied on facts that we now know to be false. This case was ridden with failures and abnormalities that warrant a reversal and further investigation. Council, let me ask, we're familiar with the motion you filed for remand, which we be taking with the case. And as I suspect, you know, this is a very unusual procedural situation. I don't recall ever seeing one like it before. So I just, to make clear what we're dealing with, I want to ask you some questions about it. The first question is, it seems to me that we have multiple matters before this Court too, primarily, namely, the issue that you initially appealed, namely, the termination by the trial court to terminate your client's parental rights after conducting a fitness portion of termination hearing and best interest finding and which the court concluded that termination was the until such time as you filed your motion for remand taken with the case, in which, if I understand correctly, you're essentially alleging fraud was committed at the trial court level, which affected the trial court's judgment. So I suppose my first question is, have I stated that correctly? And if so, is my judgment or is my opinion correct that regarding to the first issue, uh, that could be one that this court can address based on the record before us, and leaving the second one to be decided subsequent proceedings? What about that? Yes, Your Honor. So yes, you did correctly state the issues. I think one thing I would, that I would say is that I'm not sure if there was fraud or there was not. I think there is an inference that facts may have been hidden from the circuit court, but I don't know for a fact that they were. So I'm not going to say that I know there was fraud, but I believe at least an inference can be drawn that those facts may have been hidden intentionally from the circuit court. And so to the court's second question, I believe that yes, you can decide today whether or not termination was the appropriate ruling from the circuit court. But having taken the motion to remand with the case, I would hope that this court would also consider whether it is in the child's best interest, and as well as with the spirit of the rules and the law that require that these cases be decided in an expeditious manner, so as to achieve the permanence for the child as soon as possible. Well, let me ask this Mr. Schmidt, to make your presentation most useful to this court, I'd ask you to divide it, if you would. The first being to address this issue on appeal based upon the record before the trial court as originally presented, which you are asserting was erroneous. And then to point out why that is, and maybe we'll have some questions about that. And then to address the matter about your motion for remand. Okay, I'll do that, your honor. Thank you. Thank you. So at the fitness hearing, the state must prove that the parent is unfit by clear and convincing evidence. Now relevant to this case, the statutory direction is that the state must prove that the parent failed to maintain a reasonable degree of interest, concern, or responsibility for the child during the course of the case. Counsel, excuse me, if I can ask you on this point of fitness. She was advised by the first worker Borland, that if she chose, if respondent chose remain with Victor, they would both have to succeed for BS their child to be returned to them. This is at a point later than when the child was originally returned during that first nine month period. And Victor didn't complete the services and she failed to complete all the services. She didn't do all the drug drops. And there were several other things that she failed to do. She violated the safety plan going back to him. So in the face of all of this evidence, how was the trial court's decision against how was this against the manifest weight of the evidence? Thank you, your honor. So I would first say regarding the drug drops. One thing that the court can consider is in determining whether or not a parent makes reasonable progress is compliance with the service plans that are put in place by BCFS or CYFS for part of this case. Now in this case, one of those requirements was to complete drug drops, but that wasn't reasonably related to anything that caused the child to be taken out or could lead to a finding of abuse or neglect. Now, certainly for someone who is addicted to drugs or uses drugs, that could lead to a finding. I've been rejected by this court for decades that somehow the trial court and this court are limited to the specific grounds which caused a subsequent orders that the trial court enters at a dispositional hearing on the parents as to what they must do to get the child back. The notion that they're limited to in a case like this where we're concerned, let's say about domestic violence, to only those matters dealing with domestic violence to remediate. As I say, this court has rejected repeatedly for decades, and I don't see any reason that we're going to now reconsider that. That seems to be what you're arguing. Well, Your Honor, the drug drops, I agree that DCFS does have wide latitude, but there is a holding, I believe it's Henry C.N. by this state's Supreme Court that says that those plans that must be reasonably related to a condition that led to a finding of abuse or neglect, or could lead to a finding of abuse and neglect. Now, in this case, there's been no allegation that Sharon has had any substance abuse problems. Well, but counsel, putting that aside for a minute, maybe that was not the best question to ask. But the point of really looking at the evidence here is she chose, respondent chose, to go back to live with her husband after the incident in July of 2020. She violated the safety plan in doing that. So in the face of that, and the fact that services by both of them were not completed, how was this against the manifest weight of the evidence that is the decision of the trial court? Yes, Your Honor. So I will note that the July 10th, 2020 incident, it was a domestic violence incident, and it was regrettable. Victor could have handled it in a better manner. I don't think any of that's in dispute, but it is much different than the allegations that led to this, to the child coming into care. Those allegations were that Victor abused Sharon, that Victor hit B.S. in the shoulder multiple times, and that Victor threatened B.S. if B.S. were to call the police. Now that's not what happened in July of 2020. Again, I'm not justifying what he did or saying it was right, but it is still different than, you know, as I say, the traditional domestic violence situation, which is the man of the home abusing or threatening his wife or children. There was no recurrence of that. Furthermore, throughout this case, Sharon's goal, as supported by DCFS and CYFS, has been to reunite the family as a family unit. And so, agreed, she violated the safety plan, but she wasn't told that violating the safety plan would result in a termination. She was told that if you violate the plan, if you're going to go back to Victor, you and Victor have to complete these things together. You guys have to make it as a team, but that was her goal. She wanted to make it as a team. She wanted the family to be reunited, and that was supported by DCFS and CYFS in the service plans. It was supported by the court and that the court held all of these hearings jointly. So, it was never separated to say, okay, Victor's looking at a termination and Sharon isn't. That was just never, that was never a thing. Furthermore, Sharon, after the July 2020 incident, she did recognize that that was inappropriate. She immediately called DCFS and reported the incident. She immediately sought alternative living arrangements, which unfortunately ended up being with her mother, and that could not have been a permanent solution. I think DCFS recognized that. I think in the case reports, it says that she went temporarily to live with her mother, except temporarily turned into too long. There had been multiple issues with Sharon's mother throughout the entirety of this case. She refused to support the permanency goal. DCFS had to call the police on her at one point because she wouldn't bring the child to the office. She said that she wouldn't allow BS to be adopted. She was going to adopt it. On top of that, she drinks up to a gallon of wine a night. She and Sharon have a strained relationship. She would withhold Sharon's disability payments. She called her a crackhead, a bad mother. So, counsel, is it your contention that your client's failure to complete the services and to get her child back was her mother's fault? It's not my position that it was her mother's fault, but the court can consider whether there were hindrances or obstacles in the way of her completing these goals and these things that she was supposed to do. With regard to progress, isn't there an objective standard as opposed to a subjective standard that we have? It is correct. There is an objective standard, but the court has to consider it in the totality. It has to look at the circumstances in which these goals were made and in which they were required or supposed to have been completed. In this case, as I say, there were hindrances. Sharon sought a life skills course. 31 years ago, this court wrote the following. Reasonable progress is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such quality that the court, in the near future, will be able to order the child returned to parental custody. How could your client on this record possibly meet that standard? What could remotely suggest that in the near future, this child could be returned to her custody? I think, Your Honor, when we look at the case in total, we see that many of the requirements, the DCFS requirements, were completed. They were already completed before the end of the first nine-month period. I understand that there was a setback after the July 2020 incident, after the September time when Sharon returned to live with Victor, but after that, they did continue to move forward. Let me go back to my question. I'm not sure you haven't answered it. The question is, what evidence in the record before the trial court at the fitness portion of the termination hearing demonstrated was sufficiently demonstrable and of such quality that the court, in the near future, will be able to return the child, in this case, BS, to parental custody? I think, Your Honor, there is the fact that there was no recurrence of domestic violence between the parents. Even after the July 2020 incident, we see that Victor, when he found out that he would have to restart his power course and couldn't afford that, he found another course to take. He completed that course. There was one drug drop where Victor tested positive for cocaine, but after that, there was none. Sharon never tested positive for any substance. For the trial court to have concluded otherwise, which it did, is contrary to the manifest weight of the evidence, meaning essentially no reasonable person could have found that Sharon was not ready to have this child returned. I believe it was, Your Honor. I think the other thing we should look at and that the court should consider is the fact that the parents didn't receive the support that they needed from CYFS. Once there was the change in caseworkers from Ms. Borla to the subsequent caseworkers, what we see there is that they didn't want to help the parents move forward. I don't think they even went and investigated. Just as an example, they wouldn't give bus tokens. They knew that Sharon didn't drive. They knew that Sharon didn't have a car. They don't even help with transportation to get to the visits. Now, nonetheless, she still was there weekly. The casework is justified. She never had to track her down. Mr. Schmidt, wasn't the biggest step backward here your client moving back in with Victor? Isn't that where things really showed a lack of progress and, in fact, a regression? I think it depends on how the court looks at it. Certainly, I can understand how it would appear that way. But if one looks at it from Sharon's perspective, that she is trying to assist Victor and support Victor in getting into his domestic violence classes and reuniting the family as a whole, I'm not sure that that's true. Furthermore, when we look at the fact that she otherwise had to stay with her alcoholic, abusive mother, I'm not sure she had a real choice here. So, no, I don't necessarily believe that was a huge step back. I can see where other people would see that. I can see that. But, no, it was continued advancement towards the goal to reunite the family as a whole. Counselor, the time is moving very quickly. I do have a couple questions about that. First, you argue that you were deprived of filing a motion to reconsider as a notice of appeal in this case was filed immediately. But the appellee argues that that's a red herring because a motion to reconsider couldn't raise new facts that occurred after the court entered the order terminating parental rights. How would you respond to that? I would respond, excuse me, that the facts that occurred after the termination hearing, after the best interest hearing, those facts, I think, bring to light potentially other facts that did occur prior to the best interest hearing. So, I think the fact that, you know, Ms. Graham testified that, oh, he's part of the family. They love him. He loves them. He calls them mom and dad. They're ready to adopt. They're going to adopt. I think the fact that only seven days later the family said otherwise, no, we're not going to adopt. It just doesn't seem like part of the family. Get him out now. I think that gives rise to an inference that facts may have been hidden from the circuit court prior to the best interest hearing. And so, at that time, those would be the facts that I would bring forward to the court potentially on a motion to reconsider. Just say, look, when we see this, there's a strong inference here that there were facts that the court did not know at the time it made the best interest decision. This information, I'm sorry. I was going to ask counsel on the same point. You seem to be asserting, if I understand correctly, that if we were to affirm based on the file of 214.01 or take additional action, claiming essentially that there is possibility of fraud upon the court, why is that? Well, I think, not I think, so the termination orders, the order finding that Sharon was an unfit parent and the order finding that it was in the best interest of B.S. to terminate her that's why this is an interlocutory appeal. I want to go back. Assuming we affirm, leaving aside all that, we affirm the trial court's judgment. That's a final decision. That's final order. It's the decision of this court. What prohibits you from being able to bring a 214.01 raising any fraud allegations that you're now suggesting might be present? My understanding is that they're interlocutory orders and therefore not subject to an attack by section 214.01. Even if they were, however, that would be a collateral attack that would prolong this case. And it would, you know, again, it would take time away from B.S.'s permanency. And those are, that's the spirit behind the rules, behind this. Well, as the appellee points out, there's a specific section in the juvenile codec, which talks about a petition under 214.01 being applicable. Except under those circumstances, do it within a year, you certainly would be well within that time. So again, I don't understand what's the problem with bringing a 214.01. Assuming for the moment we were to affirm and you claim that there's potential fraud here, why couldn't you do that immediately? Well, I think, I think, your honor, at best, at best, the law on that point is unclear. And I did so on whether or not, on whether or not the order is final and appealable. Certainly the Supreme Court rules. I mean, we're here under a Supreme Court rule. You're telling me that the judgment of this court, affirming the trial court's termination of parental rights, is that somehow a final judgment on that matter? So you're not sure whether you can bring a 214.01? I believe, your honor, we're on appeal to this court under an interlocutory appeal. That is the rule under which I did appeal. The state has not challenged that. That is a rule of this court, of the Supreme Court that says that these appeals are interlocutory appeals. So if I can ask a follow up question, I think what Justice Steinman was asking was after we decide this case, isn't that going to be a final judgment from which you can bring a 214.01? Assuming it is, the question I have is if we decide this case on the merits now, would there not be some race judicata potential issues or considerations that would affect your client if that were to be what happens? Notwithstanding the 214.01, if we were to go ahead and decide the merits? Yes. My understanding is that I'm here today on an interlocutory appeal. I understand that this court's judgment affirming would be final, but I'm not sure that that makes the interlocutory nature of the circuit court's final orders themselves subject to a 1401 appeal. All right. Well, I think we're talking about two different stages. I'm not sure I'm responding to Justice Steinman's question. Anyway. Okay. Thank you, counsel. We'll hear from you again in rebuttal, and this is now an opportunity for Ms. Harrington on behalf of Eppley. Thank you. Good afternoon, your honors. May it please the court. My name is Gwen Harrington, and I represent the people of the state of Illinois. Your honors, I wanted to ask which one would you like me to answer, counsel's motion to remand or the merits of the termination case? The merits first, and then you can go into the motion. Okay. Absolutely. Thank you, your honors. Here is overwhelmingly clear, your honors, that the trial court properly found the respondent mother unfit for several reasons. In the second nine-month period, she was found unfit for failure to make reasonable progress and failure to make reasonable efforts. On a separate finding, she was also found unfit for failing to show a sufficient degree of responsibility or concern for her child. As the justices have mentioned, this is a clear and convincing standard which the state absolutely met, and the trial court's order was definitely not against the manifest weight of the evidence, meaning that an opposite decision would be clearly evident. I'd like to start with first the interest, concern, or responsibility counts. At trial, caseworker Deshmukh testified that she felt that the surface visits between the mother and BS were surface level at best. The mom was apathetic about the virtual visits during COVID and explained her the lack of interest in those visits as being not tech savvy. And we all know if she was interested in seeing her child, if she missed her child, she would take any opportunity to see him, whether it was virtual or in person. And she could have asked the agency to help her with this, but she didn't. Deshmukh also said, oh, that she had to move her entire schedule around one day because the parents insisted on meeting their child, but the caseworker who was going to be in charge of the visits had COVID. And caseworker Deshmukh tried to explain to the parents that this was really impossible based on her schedule. They complained, so she completely rearranged her entire day. The respondent mother, neither parent showed up or responded back to caseworker Deshmukh for four solid days. That in and of itself, Your Honor, shows a lack of concern, interest, or responsibility in BS's welfare. Turning to reasonable progress towards the return of the child, Your Honors, it's an objection. Objectively, the respondent did not make the progress that she needed to make to have her child returned to her in the near future. I think it seems that we are in agreement that this case really turned upon when the father emitted domestic battery up the border and a safety plan was put into effect. And the mother herself chose to bring herself and BS to her house, but I don't know the exact word. She either said she felt stifled there or something. And so she left her child there and went back to her abusive husband who had failed taking his PAR classes to deal with his anger management. She knew this, and she chose this abusive man over her son. And I believe it was caseworker Borla that said it was at that point that everything went downhill. Everything went downhill. She stopped doing her drug drops. She stopped attending some of her counseling. It was just one thing after another, Your Honors, that made it quite clear that the respondent mother had made really no progress whatsoever. And even with reasonable efforts, which is a subjective standard, based upon the mother had the ability to want to get to try to get her child back, and she simply didn't make the efforts. And I disagree with opposing counsel saying that the agencies were not helpful. They were more than helpful. Many of them testified that they couldn't get a hold of the mother through text or email or in person over and over again. She didn't listen to take the drug drops when she was ordered to. And in response to opposing counsel's argument, the drug drops were really related to one of the reasons why B.S. was taken out of the home. Although she was not taking any drugs, it was stated in the adjudicatory order, I believe, that the father was taking cocaine, was using cocaine. So just because the mother denied using it in the intake assessment does not mean that the agency was without authority to say, hey, no, we need to track you to make sure you're clean. But she took it upon herself to say, no, I don't need to do this. And that right there showed that she didn't make reasonable efforts towards the return of her child. Ms. Harrington, I have a question regarding the best interest finding. Given the importance of rights involved in this case, the rights that are at stake, and that Graham's testimony, the worker named Graham, gave inaccurate testimony, and that the trial court's decision was based regarding best interest largely on the factor of permanence as opposed to at least articulating consideration of the other factors. Why wasn't the decision on best interest against the manifest weight of the evidence? Thank you, Your Honor. First, two responses to that question. The trial court did a really good job, and you are correct. The caseworker, Graham, misspoke about the incident with the border. And I believe she said that the father beat up B.S. and beat up respondent mother, which was inaccurate. The trial court immediately said on the record, that is inaccurate. However, I do find that her testimony with regard to the best interest hearing is credible, and I'm not going to make my decision based on that inaccurate information. So I think the trial court immediately corrected that error. And second, although the trial court did talk about the Millers and what a good family they were and everything else, he also made quite clear that the respondent mother's parental rights were being terminated because she just in a domestic violence environment that severely impacted her child. In fact, I really like this quote. If you don't mind, I'd like to read it to you. The trial court said, and I still think there is no recognition here about the dangers of domestic violence in regards to all of the factors I have to look at. He's referring to the statutory factors. So physical safety, development of the child's identity, culture, familial, religious background, and ties. I mean all of that. If you live in a home that has domestic violence, none of that develops. And I also wanted to say, Your Honor, that there is case law that a trial court can properly terminate a parent's rights, even if there's not a prospective adoptive parent in the wings. In fact, this actual and I would be happy to move to supplement authority with this court. I did not put it in my original brief because those facts were not in this case whatsoever. And the state strongly urges this court to look at the four corners of the record here and not at any extrajudicial allegations by counsel. What about the motion? Okay, thank you. This court should deny respondents motion for several reasons. First, there's no case law or statutory authority for this motion whatsoever. And if this court did grant the motion, it would set such dangerous precedent. Where would you draw the line? Counsel here says, Oh, this happened seven days later. Is seven days the line? What if it happened two weeks later? What if it happened three months later, then there will be no finality to these termination parental rights. And the whole legislative reasoning of it, of this whole system is that these children are not left in limbo. Years ago, but counsel, there's no adoptive parent that we know of right now available for this child. What relief would the appellant have? In this case, I believe it's your argument that respondent could file a 214-01. But if this is an interlocutory, if the trial court's judgment was if this is an interlocutory appeal, and we know we've got at least some Supreme Court authority saying that it is we've got Haley D, the 2011 Supreme Court case where our Supreme Court told us it was. Doesn't that undermine your argument that a 214-01 could be filed now? Um, first, Your Honor, I did cite in my objection to the motion case, I believe it was in 2014, it was a fifth district in Ray Li you perhaps. And in that case, the appellate court did say that they are final orders. But even if this court holds that it's an interlocutory order, then this, then the decision that this court would make on the trial court's orders, finding respondent unfit and terminating her parental rights would be the final order that this respondent mother could use to do a 214-01 petition within a year. If that's the case, if it's not interlocutory, she could do it from within a year of May 18, 2022, when the trial court entered its order terminating her parental rights. Either way, the Juvenile Court Act gives respondent mom an avenue for an additional petition. This certainly is not it, Your Honors. I, it stretches the imagination to think how this court would have the authority to remand this case after it has been completely done below. And also, I wanted to point out too, that the trial court's order when it terminates parental rights, and it allows DCFS the power to consent to adoption, it never puts the name of the prospective adoptive parents in there. So there was no, you know, if it was the Millers, then it was nobody. This is the trial, this is the agency trying to give this child some permanency. No matter if it were the Millers or nobody else, that doesn't change the fact that this respondent mom was completely unfit to parent her child. So- Counsel, excuse me. If we render a judgment on the merits in this appeal, would principles of race judicata prevent the respondent from challenging the termination order in the section 214.01 petition? I do not believe so, Your Honor, because he is alleging new facts. I can't say how the merits of that petition would work for him, but he's not alleging, you know, he's alleging what happened seven days after the trial court entered the order terminating the respondent mother's parental rights. Really, all of his, the motion to remand, you know, there was no facts that were hidden from the court. There was absolutely not a scintilla of evidence that there was any fraud upon the court whatsoever. Sometimes it happens. Adoptive parents back out. That's- One week afterwards, it's found out that the foster parents didn't bond. I mean that the timing is a bit questionable, is it not? Yeah, Your Honor, even if you find the timing a bit questionable, looking at facts again that happened after this order would open up a can of worms that could never be shut. Again, where do we draw the line? And there's a lot of evidence in the record that this poor 11-year-old boy who's been through a lot in his life, he had a lot of problems. He was not an easy child. Maybe this is what happened. Maybe the Millers finally decided they couldn't do it anymore. We don't know. But I don't believe it's our part to be looking into the motives of the prospective adoptive parents. Because at the termination of parental rights, we're looking at whether respondent mom, whether it was in B.S.'s best interest to terminate respondent mom's all the evidence in this case, Your Honors, the people respectfully argued that the trial court properly denied, properly found respondent unfit on all three grounds and properly found that it was in the child's best interest to terminate her parental rights. Counsel, with respect to your suggestion that if we allowed remand, that would simply open the door in any case. This wouldn't be for new evidence or re-weighing of evidence, but to address potential fraud. Does that not make this request different? Respectfully, Your Honor, I do not think so. Because again, you know, even counsel started out his argument by saying, I don't know if there's fraud or not. But how is he supposed to know without the hearing? I mean, there's a I apologize. Right. I mean, you're you're drawing this picture of opening the door to to basically any new evidence, upsetting a determination on the parental rights. But really, the door is fairly narrow, because it would only have to do with situations where there was fraudulent information that affected the court's judgment. Isn't that a much narrower circumstance? Respectfully, Your Honor, even if it is a much more narrow circumstance, I think it it widens a lot when you talk about there are circumstances where the adoptive parents fall through or they just decide they don't want to do it anymore. And that's and that's exactly the point I'm asking you about. OK, that's not fraud. Right. So the question is, if if there was some in obtaining this decision, doesn't the child deserve to have that question answered? Thank you for clarifying, Your Honor. The answer is respectfully, no, not in these proceedings. There's no case law to support any proposition that this court has the authority or any statutory authority whatsoever to remand this case based on some allegations of fraud. That's why the the opposing counsel and respondent mom has absolutely no ground to request this remand. Thank you. Thank you. Anything from the council? Yes, Your Honor. Thank you. Wait just a moment. Sorry. No, Your Honor. Nothing further. OK, thank you. Then, Mr. Schmidt, any rebuttal, sir? Well, my apologies, Your Honor. Thank you. Yes, I do have a rebuttal. Would you hold that for a minute, please? And let me ask a question. Of course. If after you, this information was learned about a week or so after the notice of appeal was filed, you could have dismissed the appeal at that point. And yet there was no dismissal. Why not? And filed a motion to reconsider that. Why was why was the case not brought to the trial court's attention at that time? It was not, Your Honor. And part of that is because the notice of appeal was already filed. It was filed automatically for for Sharon. But on top of that, there was also delays in me getting the record. There was delays because I was appointed. So there was delays in getting the record to me. There was delays in me being able to access anything that was within the record. There was delays in me getting my appearance filed. Even with this court, I received letters from this court indicating, you know, hey, Mr. Schmidt, where's your docketing statements? But the fact was that I hadn't received anything. I wasn't able to request that docketing statement because of the time it took for me to get appointed and for that appointment to take effect. OK, so you're saying now you're hamstrung because this is an interlocutory appeal. So would you not have more flexibility by dismissing this appeal and filing 213-01 or some other pleading to get the matter before the trial court? Well, the 213-01 petition would be the motion for reconsideration or to vacate or something of that nature. But the time has passed for that. That's limited to 30 days after the order was stuck with, I'll say, a 14-01, if that's even available. And I don't believe that it is because I don't believe that the trial court's orders were final orders pursuant to the Supreme Court's rules. But now you're wanting to do discovery and you're wanting this court without the discovery or the information you need to actually take the action and remand the case to the trial court. And yet you don't have the information you need to present to the trial court. That is correct, Your Honor. And so what I am asking the court to do by way of the motion to remand is to remand this case. And to be clear, I think that the information that was learned, and I will say another thing is that although it was learned by Ms. Graham only a week after the hearing, it was learned by Sharon later than that. I don't know the exact date off the top of my head. But it was not only a week later, because it was after the child had already been living with her mother, which I believe Ms. Graham averred was two weeks after the hearing. Counsel, you heard Ms. Harrington say it's seven days in this case, what if it were a month or seven months, the same information came up? How do you respond to that? Would you still say G 214-01 wouldn't be available? I think it is a different situation when it has been a longer amount of time. Those are the facts that are before me. I would say that potentially in this case, I think the court could limit its decision to saying if it were within the amount of time that within which the, you know, the respondents in this case, Sharon could have filed a section 213-01 petition should be for reconsideration, or to vacate. Use that as a guideline. You mentioned, by the way, that one Supreme Court case, which was procedurally odd and strange. Um, so is there any case that is on point suggesting that the appeal from termination of parental rights is not a final repealable order, which specifically so states? I don't recall such a case, Your Honor, no. Well, we have several decades worth of litigation on that point. Don't you think it would come up if it were true? I would say so. So yes, so there is there is one decision and the name of it escapes me at this point. I believe it's cited in my reply brief in which the court the court holds that's an interlocutory order. That's been the rules of the Supreme Court for, you know, since since whatever time that rule was put into place. If we were to disagree with this assessment and agree that because of the strange circumstances of this case, there should be a hearing before the trial court. Is there any reason why you couldn't file 214 and one here? I know you say, well, it's not a final people water. If we disagree with that, why couldn't you do it and then have a hearing in front of the trial court, present everything you'd want to present? I see that I'm out of time. If the court will respond. Thank you, Your Honor. If that's what the court were to rule, then that is likely what what I would do. That said, I think that would be subject to attack by the state. So if I were to if this court were to so rule, okay, go back and file your 1401 petition. If I were to go back to the trial court and file that I would expect the state's response to be that's not a final and appealable order. You can't attack it via 1401. Rather, you have to wait for the adoption order. And we don't know when that adoption order is coming. Well, I suppose one other thing we could do, though I'm very skeptical about this business, it's you couldn't file it, is we could, as part of our decision, affirm the trial court and deny your motion for leave to remand and direct the trial court to permit you instead to file a 214-01 petition and proceed accordingly. What about that? I believe, Your Honor, that, of course, I think this court can do that. But wouldn't that give you all the relief you need? Potentially not. Because if, if, if the statutory authority section 214-01 is, of course, a statute, so the trial court is going to dismiss your petition, despite our telling it that it should proceed on the petition. Is that your argument? I'm sorry, Your Honor. The trial court is going to dismiss your 214-01 petition, despite our direction that it should to entertain your petition? Well, I, I would guess that the trial court would be reluctant to do that. But I would, however, anticipate that argument from the state. And if the trial, if the trial court were then to allow it to go forward, it would be potentially another appeal by the state this time. Would the state be stopped from making that argument, given the argument it's now made in this court that you are, of course, entitled to file a 214-01? I'm not, it might be a stop from doing that, but it might not. Given the argument for it, would it be a stop? Well, the argument would be that despite that it made that argument, it was incorrect at the time it made that argument. And the statutory direction is that a 14-01 petition can only attack a final and appealable order. Okay, counsel. Thank you both for your presentations. We'll take this matter under advisement and be in recess.